# United States Court of Appeals
# for the Federal Circuit

---

2013-1338, -1346

## ABBVIE DEUTSCHLAND GMBH & CO., KG, ABBVIE BIORESEARCH CENTER, INC., and ABBVIE BIOTECHNOLOGY, LTD.,

Plaintiffs-Appellants,

v.

## JANSSEN BIOTECH, INC., and CENTOCOR BIOLOGICS, INC.,

Defendants-Appellees.

Appeals from the United States District Court for the District of Massachusetts in consolidated Case No. 09-CV-11340, Judge F. Dennis Saylor, IV.

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Emily C. Johnson
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
Phone: (202) 887-4000
Fax: (202) 887-4288

*Counsel for Defendants-Appellees Janssen Biotech, Inc. and Centocor Biologics, Inc.*

Dianne B. Elderkin
Barbara L. Mullin
Steven D. Maslowski
Angela Verrecchio
Matthew A. Pearson
Akin Gump Strauss Hauer & Feld LLP
Two Commerce Square, Suite 4100
Philadelphia, PA 19103-7013
Phone:  (215) 965-1200
Fax: (215) 965-1210

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees certifies the following:

1. The full name of every party or amicus represented by me is:

   Centocor Ortho Biotech, Inc. (now known as Janssen Biotech, Inc.) and Centocor Biologics, LLC.

2. The name of the real party in interest represented by me is:

   Centocor Ortho Biotech, Inc. (now known as Janssen Biotech, Inc.) and Centocor Biologics, LLC.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Centocor Ortho Biotech, Inc. is a 100% wholly owned subsidiary of Johnson & Johnson. Centocor Biologics, LLC is a 100% owned subsidiary of Centocor Research & Development, Inc., which is 100% owned by Janssen Biotech, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   AKIN GUMP  STRAUSS HAUER & FELD LLP:  Dianne B. Elderkin, Barbara L. Mullin, Steven D. Maslowski, Angela Verrecchio, Matthew A. Pearson, Emily C. Johnson, Domingo M. Llagostera.

   NUTTER, MCCLENNEN & FISH, LLP:  Heather B. Repicky

   WOODCOCK WASHBURN LLP:  James Vaughn Spencer, John F. Murphy

Dated:  November 29, 2013          By:    /s/Dianne B. Elderkin
                                          Dianne B. Elderkin

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ......................................................1

JURISDICTIONAL STATEMENT .........................................................1

COUNTER-STATEMENT OF ISSUES ON APPEAL ...........................1

COUNTER-STATEMENT OF THE CASE ............................................2

STATEMENT OF FACTS ......................................................................4

I.     ANTIBODIES .................................................................................4

II.    THE PATENTS-IN-SUIT .............................................................7

       A.    Abbott Scientists Described A Single Family Of Closely-Related, Structurally Similar Antibodies ...............................7

       B.    The Patents-In-Suit Claim All Antibodies Of Any Structure That Have The Desired Properties .......................................8

III.   THE 146 ACTION AND INFRINGEMENT ACTION ................9

IV.   TRIAL ............................................................................................9

       A.    Consolidated Invalidity Trial ...............................................9

       B.    The Evidentiary Ruling Under Rule 403 ...........................11

       C.    Jury Instructions .................................................................14

       D.    Verdict, Judgments, And JMOL Decisions........................15

SUMMARY OF RESPONSIVE ARGUMENT....................................16

ARGUMENT ........................................................................................19

V.    STANDARD OF REVIEW .........................................................19

VI.   THE JUDGMENT OF INADEQUATE WRITTEN DESCRIPTION SHOULD BE AFFIRMED..............................................................20

A.   The Written Description Must Evidence Possession Of The Entire Invention As Claimed ...........................................................20

B.   A Wealth Of Evidence Demonstrated That The Patent Disclosures Do Not Meet The Representative Species Test..............22

     1.   The Patent Disclosures Are Limited To A Single Family Of Closely Related, Structurally Similar Antibodies ..............23

     2.   The Antibodies Encompassed By The Functionally-Defined Genus Have Widely Varying Structures....................23

     3.   The Joe-9 Examples Are Not Representative ..........................27

     4.   The Specification Does Not Enable One To Visualize Or Recognize All Members Of The Claimed Genus Of Antibodies ................................................................................28

     5.   Abbott Improperly Attempts To Ignore Structural Variability ................................................................................29

     6.   Abbott's Evidence Purporting To Show Disclosure Of Representative Species Is Not Relevant ....................................33

     7.   Abbott's Arguments Are Contrary To The Purpose Of The Written Description Requirement......................................35

VII.   THE JUDGMENT OF NONENABLEMENT SHOULD BE AFFIRMED ...............................................................................36

    A.   Law Of Nonenablement ...............................................................36

    B.   A Wealth Of Evidence Supports The Nonenablement Verdict ..........37

VIII.   THERE IS NO BASIS FOR VACATING AND REMANDING BASED ON COLLATERAL ESTOPPEL.....................................39

    A.   Abbott Waived Its Collateral Estoppel Argument ..............................39

     1.   First Circuit Law Governs The Question Of Waiver...............39

     2.   Abbott Failed To Renew Its Pre-Verdict Motion For Summary Judgment On Collateral Estoppel.............................41

B.      If Collateral Estoppel Is Not Deemed Waived, The PTO's Decision In The Co-Pending Interference Still Does Not Preclude Centocor's Validity Arguments In The Infringement Action ........................................................................................41

     1.      The Interference Decision Was Not A Binding Final Judgment ..................................................................................42

     2.      Centocor Did Not Have A Full and Fair Opportunity To Litigate Validity At The PTO ....................................................45

IX.      A NEW TRIAL WAS PROPERLY DENIED .............................................47

     A.      Standard For A New Trial Based On Alleged Evidentiary Error .......47

     B.      The Challenged Evidentiary Rulings Were Entirely Appropriate ......49

     1.      The Court Properly Foreclosed Abbott From Presenting Confusing Evidence Of Marginal Relevance ...........................49

     2.      Abbott Mis-Describes The Record ...........................................53

     3.      Abbott Has Not Shown That Judge Saylor's Rulings Affected Its Substantial Rights ....................................................56

     C.      The *i4i* Instruction Was Proper ..............................................................57

     1.      The *i4i* Instruction ....................................................................57

     2.      Judge Saylor Properly Declined Abbott's Proposed Instruction ................................................................................59

     3.      There Was No Prejudice ...........................................................61

CONCLUSION ...............................................................................................62

CERTIFICATE OF COMPLIANCE........................................................................64

CERTIFICATE OF SERVICE ...............................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Achille Bayart & Cie v. Crowe*,
    238 F.3d 44 (1st Cir. 2001) ..............................................................48

*ALZA Corp. v. Andrx Pharms., LLC*,
    603 F.3d 935 (Fed. Cir. 2010) ........................................................37

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    147 F.3d 1374 (Fed. Cir. 1998) ......................................................50

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..............................passim

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*,
    713 F.3d 1377 (Fed. Cir. 2013) ......................................................41

*Bayer CropScience AG v. Dow AgroSciences LLC*,
    728 F.3d 1324 (Fed. Cir. 2013) ......................................................32

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
    402 U.S. 313 (1971)..........................................................................45

*Bose Corp. v. JBL, Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001) ...............................................47, 48

*Bruning v. Hirose*,
    161 F.3d 681 (Fed. Cir. 1998) ........................................................10

*Callaway Golf Co. v. Acushnet Co.*,
    576 F.3d 1331 (Fed. Cir. 2009) ......................................................50

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
    541 F.3d 1115 (Fed. Cir. 2008) ...............................................passim

*Coakwell v. United States*,
    292 F.2d 918 (Ct. Cl. 1961)............................................................43

*Espeaignnette v. Gene Tierney Co.*,
   43 F.3d 1 (1st Cir. 1994) .................................................................48

*Fujifilm Corp. v. Benun*,
   605 F.3d 1366 (Fed. Cir. 2010) .......................................................40

*Genentech, Inc. v. Novo Nordisk A/S*,
   108 F.3d 1361 (Fed. Cir. 1997) .......................................................37

*Goodman v. Bowdoin College*,
   380 F.3d 33 (1st Cir. 2004) ..............................................................61

*In re Alonso*,
   545 F.3d 1015 (Fed. Cir. 2008) ..................................................31, 32

*In re Angstadt*,
   537 F.2d 498 (CCPA 1976) ..............................................................38

*In re Van Geuns*,
   946 F.2d 845 (Fed. Cir. 1991) .........................................................42

*Isom v. Town of Warren*,
   360 F.3d 7 (1st Cir. 2004) ................................................................40

*Ji v. Bose Corp.*,
   626 F.3d 116 (1st Cir. 2010) ......................................................40, 41

*Johnston v. Beachy*, Interference No. 104,286,
   2001 Pat. App. LEXIS 7 (B.P.A.I. 2001) .......................................45

*Kelley v. Airborne Freight Corp.*,
   140 F.3d 335 (1st Cir. 1998) ............................................................48

*Latin Am. Music Co. v. Media Power Group, Inc.*,
   705 F.3d 34 (1st Cir. 2013) ..............................................................42

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
   730 F.2d 1452 (Fed. Cir. 1984) ..................................................57, 60

*Microsoft Corp. v. i4i Limited Partnership*,
   131 S.Ct. 2238 (2011) .............................................................2, 58, 60

*Morgan v. Daniels*,
   153 U.S. 120 (1894)............................................................................44

*Noelle v. Lederman*,
   355 F.3d 1343(Fed. Cir. 2004) .........................................................32

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
   723 F.3d 1336 (Fed. Cir. 2013) .........................................................21

*Ortiz v. Jordan*,
   131 S. Ct. 884 (2011)..........................................................................40

*Parker v. Gerrish*,
   547 F.3d 1 (1st Cir. 2008)...................................................................40

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,
   170 F.3d 1373 (Fed. Cir. 1999) .....................................................41, 44

*Regents of the Univ. of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997) .....................................................21, 36

*Rexam Indus. Corp. v. Eastman Kodak Co.*,
   182 F.3d 1366 (Fed. Cir. 1999) .........................................................43

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ...........................................................36

*Streamfeeder, LLC v. Sure-Feed Sys., Inc.*,
   175 F.3d 974 (Fed. Cir. 1999) ...........................................................40

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
   659 F.3d 1186 (Fed. Cir. 2011) ...............................................43, 46, 47

*United States v. Utah Constr. & Mining Co.*,
   384 U.S. 394 (1966)............................................................................44

*United States v. Winchenbach*,
   197 F.3d 548 (1st Cir. 1999) ..............................................................48

*Vas-Cath, Inc. v. Curators of the Univ. of Mo.*,
   473 F.3d 1376 (Fed. Cir. 2007) .....................................................42, 43

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) ....................................................43, 47

STATUTES

28 U.S.C.
    §1295(a)(1) ............................................................................1
    §1295(a)(4)(C) ......................................................................1
    §1331....................................................................................1
    §1338(a) ...............................................................................1


35 U.S.C.
    §135..............................................................................42, 43
    §141....................................................................................42
    §146................................................................................passim

OTHER AUTHORITIES

37 C.F.R. §41.121(a)............................................................46

37 C.F.R. §41.150 ................................................................45

37 C.F.R. §41.154(a)......................................................43, 45

37 C.F.R. §41.204(b) ...........................................................46

Fed. R. Evid. 403 ...........................................................passim

## STATEMENT OF RELATED CASES

Appellees are not aware of any other appeals that have been filed from the underlying district court litigation. Appellees are not aware of any other litigations that will directly affect or be directly affected by this Court's decision in the present appeals.

## JURISDICTIONAL STATEMENT

Appellees agree that the district court had jurisdiction under 28 U.S.C. §§1331 and 1338(a) and that this Court has jurisdiction under 28 U.S.C. §§1295(a)(1) and (a)(4)(C). Both Appellants and Appellees underwent name changes during the course of the litigation. Since the entire trial record refers to Appellants collectively as "Abbott" and refers to Appellees collectively as "Centocor," Appellees use those designations in this brief.

## COUNTER-STATEMENT OF ISSUES ON APPEAL

1.      Is the jury's verdict that the patents-in-suit[1] are invalid for failing to adequately describe and/or enable the wide and unknown universe of functionally-claimed antibodies supported by substantial record evidence?

2.      Did Abbott waive its collateral estoppel argument by failing to raise it in a JMOL motion, and if not, did the district court err in allowing Centocor to

---

[1] U.S. Patent No. 6,914,128 ("the '128 patent") and U.S. Patent No. 7,504,485 ("the '485 patent").

present invalidity evidence notwithstanding the PTO's non-final interference decision pertaining to the '128 patent?

3.     Did the district court abuse its discretion in relying on Fed. R. Evid. 403 to exclude evidence of portions of the interference record where the likelihood of creating jury confusion was outweighed by its potential relevance?

4.     Did the district court commit prejudicial error in declining to instruct the jury that Centocor had the burden to prove that new invalidity evidence had to be more material than that which was before the PTO when the court's instruction on this issue was consistent with *Microsoft Corp. v. i4i Limited Partnership*, 131 S.Ct. 2238 (2011)?

## COUNTER-STATEMENT OF THE CASE

Abbott asserted two patents against Centocor in a lawsuit in the United States District Court for the District of Massachusetts ("Infringement Action"). One of those patents, the '128 patent, was previously involved in a patent interference proceeding before the PTO and was the subject of a Section 146 Action ("146 Action") before the district court.

In September 2012, the court held a two week trial to resolve both proceedings.  In the Infringement Action, the jury found that Centocor proved, by clear and convincing evidence, that the asserted claims are invalid on three independent grounds – lack of written description, nonenablement, and

2

obviousness. The court entered judgment in the Infringement Action on that verdict. After trial, the court also entered judgment in the 146 Action that the asserted claims of the '128 patent are obvious.

In this appeal, Abbott does not raise any substantive challenge to either of the invalidity judgments based on obviousness. Such judgments will thus stand, and the asserted claims will remain invalid, unless Abbott convinces this Court that its procedural issues justify a remand and/or a new trial. As a consequence, if Abbott's procedural challenges fail, this Court need not decide Abbott's substantive (written description and enablement) arguments, as either of the obviousness judgments below is sufficient to independently support affirmance. By the same token, should Abbott's effort to overturn the verdicts on either of these other substantive issues fail, an affirmance will similarly be mandated.

## STATEMENT OF FACTS

### I.     ANTIBODIES

Antibodies are proteins made by the immune systems of humans, mice, and other animals that bind to and neutralize undesirable substances in the body.  The target to which an antibody binds is called an "antigen."  The target antigen of the antibodies in this lawsuit is the protein IL-12.

Antibodies are made of chains of amino acids that are connected together by chemical bonds, illustrated in Figure 1 as follows:



A=Alanine
R=Arginine
N=Asparagine
D=Aspartic Acid
C=Cysteine
Q=Glutamine
E=Glutamic acid
G=Glycine
H=Histidine
I=Isoleucine
L=Leucine
K=Lysine
M=Methionine
F=Phenylalanine
P=Proline
S=Serine
T=Threonine
W=Tryptophan
Y=Tyrosine
V=Valine

**Figure 1.  The twenty amino acid building blocks for antibodies.**

While there are only twenty different amino acids, trillions of antibodies, each with a different combination of amino acids, can be built from these building blocks. A7272; A7300.

Just as scientists describe chemical compounds by their particular chemical formula (showing, *e.g.*, how carbon, hydrogen, oxygen atoms are arranged), they describe antibodies by their amino acid "sequence," a listing of the amino acids in the order in which they are positioned in the antibody chain. For example, the sequence illustrated in Figure 1 above – CWTRDMES – is cysteine-tryptophan-threonine-arginine-aspartic acid-methionine-glutamic acid-serine.

The amino acid sequence of an antibody determines what properties the antibody has. An antibody's amino acid sequence is critical for determining whether it will bind to IL-12 at all. A7010. Moreover, the antibody must bind to IL-12 in the right place to neutralize IL-12, and where the antibody binds is also determined by the antibody's particular amino acid sequence. A7015; A7341; A7436.

In this litigation, the focus is on the amino acid sequence of a part of the antibody called the "variable region." The variable region of the antibodies disclosed in the patents-in-suit comprises four chains (two identical chains called "heavy" chains and two identical chains called "light" chains) of over one hundred amino acids each. A377-80; A6577-78.

Changing even a *single* amino acid in the variable region of an antibody – *i.e.*, replacing the amino acid with one of the nineteen other amino acids – can make the difference between whether an antibody binds to a desired target, or not, how tightly it binds, and whether it has any biological activity. A6624; A6895; A7008. In fact, Abbott's expert testified about specific examples where changing even a single amino acid in the variable region of an antibody changed the antibody from one that bound to a target to one that did not bind to a target. A7347-48; A7370.

Importantly, there is no way to predict what will happen to the function of any antibody disclosed in the patents-in-suit if even a single amino acid is changed. A6625. As Abbott's expert admitted, even though the patents-in-suit disclose a number of antibody examples encompassed by the claims, one cannot predict the amino acid sequence of *other* antibodies within the claims based on the information in the patents-in-suit; he expressly stated that it is *not possible* to "visualize" other antibodies covered by the claims without actually making and testing them. A7429-30.

The unpredictable relationship between amino acid structure and function of the subject IL-12 antibodies – which is undisputed – is especially meaningful in this case because, as described below, the asserted claims define the claimed antibodies by their function, rather than their structure. That functional definition

6

sweeps in antibodies of variable and unpredictable structures, even though the patent specifications do not evidence that the inventors were in possession of such a variety of antibodies and do not enable them.

## II.     THE PATENTS-IN-SUIT

### A.      Abbott Scientists Described A Single Family Of Closely-Related, Structurally Similar Antibodies

The patents-in-suit disclose the development of a single family of closely-related human antibodies that bind to IL-12, all derived from a single antibody called "Joe-9."  A6563-64; A6893-94.

As the first step of their development work, the inventors used known techniques of screening a phage display library for antibodies that bind to IL-12. A6921-22; A410.  They isolated several IL-12- binding antibodies in this way, each of which had a different amino acid structure, and selected one of them – an antibody called "Joe-9" – for further development.  A405-06; A6890-94; A15207-08.

To enhance the binding properties of Joe-9 – how tightly it binds to IL-12 and how well it neutralizes IL-12's biological activity – the inventors generated a series of new antibodies by changing individual amino acids in the binding region of Joe-9.  A6967-68; A405; A442-45.  The changes were made as a matter of trial-and-error since there was no way to predict whether changing even a single amino acid would have an effect on the antibody's functional properties.  A6895.  By

trying and testing individual amino acid changes in the binding region of the antibodies, the inventors eventually arrived at the preferred antibody of their invention – called "J695." A442-45; A6894-97. The patents-in-suit disclose the structure of a number of the antibodies made from original Joe-9 in this fashion, all of which are structurally closely related to one another, but disclose no antibody outside the Joe-9 family. A6893-94; A6623-24; A7548.

The Abbott inventors could have generated families of antibodies derived from the other IL-12-binding antibodies they isolated from the phage display library. A7425. In fact, Inventor Elvin testified that that he would have preferred to develop an antibody other than Joe-9. A15207-08. But they developed only Joe-9. *Id.* There could be many different families of antibodies in addition to the Joe-9 family, including families based off of the other antibodies isolated from the phage library, that could be within the claim scope, A7424-25, but none of them are disclosed in the patents-in-suit because, as Inventor Salfeld explained, the patents-in-suit "focus[] on [the] Joe-9 lineage." A6893-94; A7005.

### B. The Patents-In-Suit Claim All Antibodies Of Any Structure That Have The Desired Properties

The claims in the patents-in-suit vary widely in scope. Some claims are limited to antibodies having specific amino acid sequences found in J695 and other Joe-9 antibodies. But those claims are not asserted in this lawsuit – because it is undisputed that Centocor's Stelara® antibody is not within the Joe-9 family – and

those are not the claims that were invalidated by the jury. The five asserted claims that were asserted in this case define the boundaries of the invention solely by how the antibodies *function*; they recite no structure. In particular, the claims recite a genus of human antibodies and define them in terms of several *functional* properties; *i.e.*, their binding to the antigen IL-12, their ability to neutralize IL-12, and a kinetic binding property ("$k_{off}$"). A583-85 (claims 29, 30, 32 and 64); A805 (claim 11).

## III. THE 146 ACTION AND INFRINGEMENT ACTION

Abbott's Infringement Action alleged that Centocor's Stelara® antibody infringed certain functional claims of the patents-in-suit. At the time, the '128 patent had already been involved in an interference proceeding in the PTO. A10115-24. Centocor had unsuccessfully contested the validity of the '128 patent claims on obviousness grounds in that proceeding, A125-64, and had timely filed for review of the case in a 146 Action, later transferred to district court in Massachusetts. A2007-13; A2016.

## IV. TRIAL

### A. Consolidated Invalidity Trial

The district court consolidated the Infringement and 146 Actions for trial, and made several pre-trial rulings that streamlined the issues to be decided. One was to bifurcate trial of validity from trial of damages and willfulness. A15326-28. Another was to grant summary judgment that Centocor's Stelara® antibody

infringes four of the five asserted patent claims. A124. Since the fifth asserted claim was also a functional claim of similar breadth, Centocor stipulated to its infringement as well. A15219-24.

As a result, the only issues presented to the jury were those pertaining to the invalidity of the asserted claims. The parties further agreed that the obviousness issue presented in the 146 Action would be presented for the court's decision based on the same record presented to the jury. A6033-34. In view of the clear-and-convincing burden of proof in the Infringement Action, Abbott conceded that the court's obviousness determination there was determinative of the obviousness issue in the 146 Action, where the burden of proof was preponderance-of-evidence.[2] A7751-52.

During the ten day trial, the jury heard evidence that the scope of the asserted claims vastly exceeded the scope of the invention made by the Abbott scientists. *See infra* §§VI, VII. While Abbott scientists did invent a family of antibodies (Joe-9 antibodies), their claims were not limited to that family, but, rather, covered *any* antibody, of *any* structure, that had the functional properties recited in the claims. A6562. These overly broad, functional claims read on an antibody like Centocor's Stelara® antibody – even though it is structurally very different from the Joe-9 antibodies in many important and unpredictable ways.

---

[2] *See Bruning v. Hirose*, 161 F.3d 681, 686 (Fed. Cir. 1998).

A6115; A6560-96. As just one example, the amino acids in the critical variable region of the disclosed Joe-9 antibodies were *50% different* from those in Stelara®. A6496; A6623. Differences of this magnitude are striking in view of the undisputed testimony from both parties' witnesses that scientists cannot predict how changing even *one* amino acid in an antibody will affect its properties. A6624; A7008. Indeed, the jury heard from Abbott's own expert that a scientist cannot "visualize" the structure of antibodies within the patent claims *other* than the exemplified Joe-9 antibodies. A7429-30.

The jury also heard that the patents-in-suit did not enable the full scope of the functional patent claims. A6641-46. The claims are so broad as to encompass antibodies falling within the "VH5" classification. A6642. Yet the jury heard that the patents-in-suit disclosed no starting materials, nor any method, for making VH5 antibodies. *Id.*

## B.    The Evidentiary Ruling Under Rule 403

Prior to trial, Judge Saylor granted Centocor's motion to exclude reference to the PTO's non-final interference decision, ruling that "Abbott will be precluded from offering the PTO Board's priority and validity decisions under Fed. R. Evid. 403, particularly in light of the fact that the court is reviewing those decisions in the § 146 action." A323; A2095-97.

Abbott raised the issue again, repeatedly, during trial. A6016-20; A2151-57;

11

A2161-67; A6242-57; A6419-40; A6464-69; A6760-81. Abbott argued that it was

entitled to show the jury what prior art had already been considered by the PTO

because "if there was prior art before the [PTO], the [clear and convincing] burden

is harder to satisfy." A6016-19. Without agreeing to Abbott's legal argument

regarding burden of proof, Centocor proposed a solution to Abbott's evidentiary

concern, namely, that the parties stipulate to a list for the jury identifying art the

PTO considered either during ex parte prosecution or during the interference.

A2161-67. Judge Saylor agreed with this approach. A6467. But Abbott never

took up the invitation.

Abbott's arguments for permitting it to present evidence from the non-final

interference proceeding then changed, from focusing on admitting evidence of

what prior art was before the PTO, to admitting evidence that Centocor

participated in a proceeding at the PTO and "chose not to submit" certain prior art

to the PTO. A2155; A6248. Judge Saylor expressed his concern that Abbott

wanted to conduct a "stealth collateral estoppel case" and pressed Abbott to

explain the legal significance of the fact that Centocor could have raised different

prior art in the interference. A6429-33. When Abbott finally answered that

question head-on, its answer was telling:

> THE COURT: Why does it have to be Centocor raised
> the issue as opposed to the passive voice, this issue was
> raised and considered at the patent office?

12

> MR. LEE: Your Honor, because that goes to the burden.
> The fact that Centocor raised this issue, and they're now
> raising it again, *should make it almost impossible to
> overcome the presumption of validity and be clear and
> convincing*.

A6773 (emphasis added). Noting that the clear and convincing burden to prove

invalidity was "[h]igh enough as it is" and that "[w]e don't need to make it

impossible," A6775, Judge Saylor concluded that he saw this as a Rule 403 issue,

and that any relevance to Centocor's participation in the interference was

outweighed by the fact that admission of the evidence would greatly complicate

the trial. A6774-75; A7743-45. He reasoned that "from a Rule 403 perspective,"

it was sufficient for the jury to hear that the PTO "considered the point, they

looked at the prior art, they reached an opposite conclusion, and Centocor has the

high burden of proving that wrong by clear and convincing evidence." A6780-81.

Abbott's motion for a new trial based on this ruling was denied. A28-48.

Judge Saylor noted that he had made his ruling on Rule 403 grounds and that

introduction of evidence of Centocor's participation in the interference would have

confused the jury and consumed "a great deal of time that was unhelpful for the

trial or for the progress of the trial." A35-36. He commented that it would have

permitted the jury to mistakenly assume that the jury would be asked "simply to

rubber stamp" an issue decided by the PTO. *Id.* He noted that he had invited

counsel to submit case law "showing that I needed to permit what he was asking

me to do," and that counsel had not done so. A39. He also noted that Abbott had not called "a proper witness or at least a witness with expert or personal knowledge to talk about the prosecution history." *Id.* Finally, he ruled that Abbott's argument presented no basis "to overturn a verdict of a jury in a relatively lengthy case." *Id.*

## C. Jury Instructions

In conjunction with the evidentiary arguments summarized above, Judge Saylor received briefing and argument on a jury instruction relating to the Supreme Court's *i4i* decision. A7479-7506; A7519-42; A2151-2233. He issued a final instruction – taken almost verbatim from the *i4i* decision – that the jury, in determining whether Centocor met its clear and convincing burden of proving invalidity, could consider whether additional evidence relied upon by Centocor, but not before the PTO, would have been material. A15176-77. He declined to issue Abbott's proposed instruction that Centocor must prove that the prior art on which it relied in this trial was "more relevant" than the art considered by the PTO and, if this was not shown, Centocor's clear and convincing burden was "especially difficult to meet." A2173-74; A7519-23.

In denying a new trial based on Abbott's objection to the *i4i* instruction, Judge Saylor stated that his instruction followed the language and logic of the Supreme Court's decision and that Abbott's argument that Centocor bore the

14

burden of proving prior art was more material than that cited to the PTO was "flatly wrong." A39-44.

### D.    Verdict, Judgments, And JMOL Decisions

The jury reached a verdict that each of the asserted patent claims is invalid on three separate grounds: (1) inadequate written description, (2) nonenablement, and (3) obviousness, and entered judgment in the Infringement Action in Centocor's favor. A7707-08; A1. The court subsequently entered final judgment in the 146 Action that the asserted claims in the '128 patent are invalid on obviousness grounds. A2.

Judge Saylor issued a detailed decision denying Abbott's motions for JMOL on written description, enablement, and obviousness grounds. A3-27. On written description, he found that the jury had ample evidence on which it could rely that the patents-in-suit disclose only examples of antibodies that are closely related structurally and that they do not disclose the full variety of the claimed genus, which includes the fundamentally different Stelara® antibody. He concluded that the evidence supports a reasonable inference that the patents do not disclose the variety of the genus "but 'merely draw[s] a fence around the outer limits of the purported genus.'" A16 (quoting *Ariad Pharms.*, *Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) (en banc)).

With respect to nonenablement, Judge Saylor ruled that uncontested evidence shows that the patents-in-suit do not enable the production of a VH5 antibody like Stelara®, and that this supported the jury's nonenablement verdict because it evidenced that the full scope of the claimed invention was not enabled. A17-18.

## SUMMARY OF RESPONSIVE ARGUMENT

**1.** *Inadequate Written Description*.  Overwhelming record evidence shows that the asserted claims encompass far more than the invention made and described by the inventors.  Abbott's patent claims encompass a genus of antibodies having great and unpredictable structural variability.  But the patent disclosures do not evidence that the inventors possessed the full scope of the claimed genus.  The patents disclose only a family – the Joe-9 family – of antibodies that are closely related in structure, while the functionally-defined limits of the claims sweep in antibodies of very different structure, like Centocor's Stelara® antibody. Undisputed evidence showed that the disclosed Joe-9 antibodies are not representative of the structural variability of the members of the claimed genus and that the patent disclosures do not enable one to "visualize" the structure of non-Joe-9 antibodies encompassed by the claims.  They leave that search to others.

Abbott does not contend that Centocor failed to present evidence on written description and does not challenge the written description jury instruction.  Instead,

it attempts to meet its high burden of showing that the jury verdict was not supported by substantial evidence only by challenging the *relevance* of certain of Centocor's evidence. In particular, Abbott argues that the structural variability of the claimed antibodies is irrelevant because the claims do not recite structure. But Abbott's arguments ignore the law requiring a patent's written description to enable one to visualize or recognize the full scope of antibodies within the claimed genus and to distinguish between the members within the genus from those outside the genus – which can only be done by consideration of the antibodies' *structure*.

Viewing all the evidence and drawing all reasonable inferences in the light most favorable to Centocor, there is substantial evidence to support the jury's verdict finding a lack of written description.

**2.** ***Nonenablement.*** Although nonenablement is a question of law, its determination turns on underlying issues of fact. The evidence showed indisputably that among the universe of structurally diverse antibodies encompassed by the claims are antibodies that scientists classify in the "VH5" structural class. Yet, the patents-in-suit disclose no examples of these antibodies, no starting materials for making such antibodies, nor any method for making such antibodies. Viewing all the evidence and drawing all reasonable inferences in the light most favorable to Centocor, there is substantial evidence to support the jury's verdict finding lack of enablement.

17

**3.** ***Collateral Estoppel.***  Abbott's collateral estoppel defense cannot prevail for three reasons.

*First*, collateral estoppel is not an issue properly before this Court because Abbott failed to renew its collateral estoppel objections in a JMOL motion.  Under controlling First Circuit law, Abbott waived the issue for appeal.

*Second*, the PTO decision to which Abbott seeks to attach collateral estoppel effect was not a final and binding decision; it was the subject of Centocor's timely-filed 146 Action in which Centocor was permitted to and did present new evidence, and in which the facts underlying the issue of obviousness were reviewed *de novo*.

*Third*, Abbott improperly seeks to apply collateral estoppel effect from the non-final PTO decision to *any* defense of invalidity, even though obviousness was the only invalidity issue presented and decided during the interference and even though Centocor had no full and fair opportunity to litigate §112 issues in that proceeding.

4.  ***No New Trial.***  Abbott's new trial request was properly rejected by Judge Saylor.  On appeal, it is similarly deficient as it fails to show "extraordinarily compelling circumstances" as are required to justify reversal of a district court's Rule 403 evidentiary ruling.

Judge Saylor properly exercised his discretion in determining that any possible relevance of Abbott's proposed evidence regarding Centocor's participation in an interference involving one of the patents-in-suit was outweighed by the potential for prejudice. Moreover, even if his ruling were deemed to be error, Abbott has still failed to prove the kind of resulting prejudice needed to justify the extraordinary remedy of a new trial.

Judge Saylor also properly instructed the jury on the burden of proof under *i4i*. He properly refused to issue Abbott's proposed instruction that Centocor somehow had the burden of proving that its prior art was more material than the prior art considered by the PTO, and that its clear and convincing burden might be "especially difficult to meet" if it did not do so. A2173-74. Abbott failed to prove that Judge Saylor's instruction was in error or that it resulted in any prejudice, a prerequisite to a new trial.

## ARGUMENT

## V. STANDARD OF REVIEW

Centocor agrees with Abbott's statements of the standards of review. However, its arguments largely ignore those standards.

## VI. THE JUDGMENT OF INADEQUATE WRITTEN DESCRIPTION SHOULD BE AFFIRMED

### A. The Written Description Must Evidence Possession Of The Entire Invention As Claimed

The purpose of the written description requirement is to "ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353-54 (Fed. Cir. 2010) (en banc) (internal quotation marks omitted).

A patent's written description "must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Id.* at 1351 (citation omitted). "[R]equiring a written description of the invention plays a vital role in curtailing claims . . . that have not been invented, and thus cannot be described." *Id.* at 1352. The written description requirement also guards against patent claims that "merely recite a description of the problem to be solved while claiming all solutions to it," and which "cover any compound later actually invented and determined to fall within the claim's functional boundaries – leaving it to the pharmaceutical industry to complete an unfinished invention." *Id*. at 1353. In short, the written description requirement serves the purpose of protecting the public from claims like Abbott's – which claim more than the inventors actually invented and which attempt to monopolize every human IL-12 antibody that may

20

ever be made, regardless of their structural differences, so long as they have the properties recited in the claims.

When a patent claims a genus, its specification must describe the invention in a way that makes it clear that the genus has been invented, not just a species of the genus. *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc*., 541 F.3d 1115, 1124 (Fed. Cir. 2008). This is particularly true when the patent claims a genus defined by functional language, because such claims run the risk of "simply claim[ing] a desired result . . . without describing species that achieve that result." *Ariad*, 598 F.3d at 1349; *see also Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1350 (Fed. Cir. 2013) (explaining that a "roadmap for producing candidate [protein molecules] and then determining which might exhibit [useful properties]" is insufficient to satisfy the written description requirement because it leaves the search to others rather than showing the results of the search).

There are two possible ways to describe a genus: the patent must disclose either (1) a "representative number of species falling within the scope of the genus" or (2) "structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad*, 598 F.3d at 1350 (quoting *Regents of the Univ. of Cal. v. Eli Lilly & Co*., 119 F.3d 1559, 1568 (Fed. Cir. 1997)). Whichever method is used, the written description must give a "precise definition" that is "sufficient to distinguish the genus from

other materials." *Ariad*, 598 F.3d at 1350.

Abbott's expert conceded that the patents-in-suit do not disclose structural features common to the members of the claimed genus. A7430-31. Thus, the focus here is whether the patents disclose representative species. Abbott also conceded that when there is substantial variability within the genus, the disclosed species must reflect the variability of species within the genus to be "representative." Abbott Br. at 29; *see Carnegie Mellon*, 541 F.3d at 1124 ("Satisfactory disclosure of a 'representative number' depends on whether one of skill in the art would recognize that the applicant was in possession of the necessary common attributes or features of the elements possessed by the members of the genus in view of the species disclosed.") (citation omitted).

## B. A Wealth Of Evidence Demonstrated That The Patent Disclosures Do Not Meet The Representative Species Test

A wealth of evidence supports the jury's verdict, reached after considering all the evidence and being properly instructed on the law. A6378-6410; A6488-98; A6537-47; A6560-95; A6607-41; A15179-81.

The undisputed evidence showed that the asserted claims encompass a genus of antibodies of great structural variability, that the Joe-9 antibodies disclosed in the patents were not structurally variable or representative of the broadly claimed genus, and that there was no way to predict or visualize what non-disclosed

antibodies would be encompassed by the claims.  This doomed the patents under

the written description requirement.

### 1. The Patent Disclosures Are Limited To A Single Family Of Closely Related, Structurally Similar Antibodies

The only examples of antibodies disclosed in the patents-in-suit are

antibodies in the Joe-9 family.  A6615-16; A7428.  These examples represent one

set of structurally-similar antibodies, with only a relatively small number of amino

acids changed from the original Joe-9 sequence.  There is only about a 10%

difference among all the amino-acid sequences of the disclosed Joe-9 antibodies.

A6585; A6623-24; A7548.

### 2. The Antibodies Encompassed By The Functionally-Defined Genus Have Widely Varying Structures

Based on their functionally-defined boundaries, the asserted claims are much

broader than the corresponding disclosure, encompassing both Joe-9 antibodies

and Centocor's Stelara® antibody in their claimed genus.  But Stelara® is not in

the Joe-9 lineage and, as described below, substantial evidence showed that

Stelara® is very different structurally from the Joe-9 antibodies.  A7424.

First, the amino acid sequences of the critical variable region of Stelara®

and the patents' J695 are about 50% different.  A6496-97.  There is no example in

the patents of any antibody that shares only 50% sequence similarity to the Joe-9

antibodies.  A6585; A6623-24; A6638; A7548.  The 50% sequence difference

between Stelara® and the disclosed antibodies is critically important because the function of an antibody is determined by its amino-acid sequence, and there is no way to predict what will happen to an antibody's function if even a *single* amino acid in its sequence is changed. A6624-25; A7008. Indeed, antibodies substantially *more* similar in sequence to the patents' disclosed J695 antibody than to Stelara® bind not to IL-12 but to completely different targets – cytomegalovirus or HIV, the AIDS virus. A6495-97.

Second, not only are the amino acid sequences of the variable regions of the patent-disclosed antibodies and of Stelara® very different, but the lengths of one of the critical CDR regions in Stelara® and J695 are different. A6495. There is no example in the patents of any antibody having CDR regions that are the same length of the Stelara® CDRs. A6638; A7548. Nothing described in the patents-in-suit suggested that the inventors possessed an invention that encompassed antibodies that have CDRs of different lengths than the Joe-9 antibodies. A6627-28. This difference is also critically important. As Abbott inventor Veldman admitted, she could not predict what effect adding or removing amino acids from the CDR regions of the Joe-9 antibodies would have on their binding properties. A7018. Abbott expert Marks testified that "certainly having different lengths" of amino acid sequences in a CDR3 region of the antibody "can turn a binding antibody into a non-binding antibody." A7370.

24

Third, antibodies are made of four amino acid chains, two identical longer chains called heavy chains and two identical shorter chains called light chains. Scientists classify antibody heavy chains into seven classes, based on their structural similarity. A6632. The heavy chain portion of the Stelara® antibody is in the VH5 class, but all of the antibodies disclosed in the patents-in-suit are in the VH3 class. A6634-35. The patents-in-suit expressly teach that other members of the VH3 class could be used to make antibodies to IL-12, stating, "[t]he high degree of amino acid sequence homology [sequence similarity] between the VH3 family members results in certain amino acid residues being present at key sites in the CDR and framework regions of the VH chain. These amino acid residues confer structural features upon the CDRs." A411 (col. 41 ll. 27-31).[3] But the patents are silent with respect to whether VH5 class antibodies could be used. The patents disclose no VH5 antibodies. A6634-35; A6638; A7445. Nothing in the patents evidence that the inventors possessed an invention that included antibodies having a VH5 heavy chain. A6635.

Fourth, scientists also classify antibody light chains into groups based on structural similarity. A6635-36. The light chain portion of the Stelara® antibody is in the kappa class, but all of the antibodies described in the Abbott patents are in the lambda class. A6636-37. Whether an antibody has a kappa or a lambda light

---

[3] The specifications of the '128 and '485 patents are identical; citations are made to the '128 patent.

chain can affect its biological properties. A6637. The patents teach that lambda light chains should be used. *Id.* They do not disclose that kappa light chains could be used and provide no example of any antibody with a kappa light chain. A6638; A7443; A7445.

Fifth, the amino acid sequence of an antibody's binding region determines the site (epitope) on the target (*e.g.*, IL-12) where it will bind. A7436. Where on a target an antibody binds is meaningful with respect to the biological activity of the antibody; an antibody must bind to the "right place" on the target for the antibody "to work." A6885-86; A6904; A7015; A7341.

Recognizing the importance of having the antibodies bind to the "right place" on IL-12 so that they have the desired binding properties, the patents each state *forty-four* times that there was a desire to retain "fine epitope specificity" of the Joe-9 antibodies, *i.e.*, that to preserve the desirable properties of the Joe-9 antibodies, it was desirable to not make changes to the amino-acid sequences of the antibodies that would change the "real fine location of where the antibody binds to the antigen." A6616-17; A6640; A6823. And, indeed, all of the Joe-9 antibodies are expected to bind to IL-12 in the same place. A6539-40.

But Centocor's Stelara® antibody and the Joe-9 antibodies bind to IL-12 at different places. A6385-86; A6539-40. Looking at the dozens of contacts that Stelara® makes with IL-12 and at the dozens of contacts that J695 makes with IL-

12 (determined from a confidential crystal structure of the J695/IL-12 complex

produced by Abbott in the litigation), not one of them is the same at a chemical and

structural level.  A6402.  There is not a single example in the Abbott patents of an

antibody that binds to the identical site on IL-12 as Stelara®.  A7548.

This evidence showing how different Stelara® is from any antibody

disclosed in the patents-in-suit showed that the asserted claims encompass a genus

of antibodies of great structural variability.

### 3.    The Joe-9 Examples Are Not Representative

Centocor's experts explained the significance of the above-summarized

evidence showing the substantial variability among members of the claimed genus

of antibodies.  Expert Siegel testified that, based on this evidence of the structural

variety among antibodies encompassed by the claims, the Joe-9 antibodies

described in the patents-in-suit are not representative of the genus of antibodies

covered by the asserted claims.  A6638-40.  He also testified that, from the

perspective of the person of ordinary skill in the art, the patents do not provide a

description showing that the inventors possessed an invention that was broad

enough to encompass a group of antibodies that includes Stelara®.  A6639.

He explained that the patent claims "cover a very, very broad group of antibodies,

antibodies that can be different in many – in a number of different ways, yet still

satisfy these claims, yet the description in the patent of what the inventors had in

their possession is very narrow compared to the breadth of the claims." A6562.

The jury was entitled to credit this evidence.

Abbott erroneously argues that Centocor's defense was premised on the contention that the disclosed antibodies were not representative of Stelara®. Abt. Br. at 34. To the contrary, the evidence showed that the disclosed antibodies were not representative of the *claimed genus* that includes both Stelara® and the Joe-9 antibodies. A6562; A6638-40. And as Judge Saylor noted, Abbott's suggestion that Centocor's defense was a "de facto non-infringement position," Abt. Br. at 37 n.9, is entirely unfounded because the jury was repeatedly informed and instructed that Stelara® infringes the claims. A6115; A6123; A6151.

### 4. The Specification Does Not Enable One To Visualize Or Recognize All Members Of The Claimed Genus Of Antibodies

The jury heard evidence that, based on what is described in the patents, there is no way to predict the amino acid sequence of any antibody, other than the specifically disclosed Joe-9 antibodies, that falls within the scope of the asserted claims. A6625. Most tellingly, Abbott's expert admitted that, based on the information in the patents, *one cannot visualize* the amino acid sequences for the antibodies that will be encompassed within the claims other than those within the Joe-9 lineage. A7429-30. This expert admission is itself substantial evidence supporting the jury verdict, as the law requires a patent to disclose a

28

"representative number of species falling within the scope of the genus or structural features common to the members of the genus *so that one of skill in the art can 'visualize or recognize' the members of the genus*." *Ariad*, 598 F.3d at 1350 (emphasis added) (citation omitted). By its own expert's admission, Abbott's patents do not do this.

Since the patent disclosures do not allow one to visualize the antibodies covered by the claims, other than the disclosed Joe-9 antibodies, one wanting to make additional antibodies within the asserted claims might try modifying the Joe-9 antibodies. But Centocor's expert explained that, if one started with the J695 amino-acid structure disclosed in the patents and made random amino acid changes to try to arrive at Centocor's Stelara® sequence, the number of possible antibodies made this way would be $10^{27} - 1$ with 27 zeros after it – more than all the grains of sand on all the beaches in the world. A6626-27. There is simply no way to predict the amino acid sequences of an antibody that will fall within the patent claims. A6625.

### 5. Abbott Improperly Attempts To Ignore Structural Variability

Abbott's suggestion that, in focusing on the structural variability of the claimed antibodies Centocor has improperly unmoored the written description analysis from the requirements of the claims, is baseless. Abt. Br. At 36. The law requires sufficient disclosure of a genus so that one of skill in the art can "visualize

or recognize" the members of the genus.  *Ariad*, 598 F.3d at 1350.  This can only be done by considering what the members of the genus actually are, and, in the case of antibodies, that requires consideration of their structure.

The functional requirements of the patent claims are intimately related to – and indeed dependent upon – the structure of the antibodies.  It is undisputed that it is the structure of an antibody – its amino acid sequence – that determines whether, to what, where, and how the antibody will bind to a target, and what biological effect the antibody will have.  A6494; A6885-86; A6968; A7010; A7015; A7266; A7268-69; A7276-77; A7367; A7370; A7430; A7435-36; A7553-54.  Thus the structure of the claimed antibodies determines whether they have the functional features recited in the claims – binding to IL-12, neutralizing IL-12, and having the recited $k_{off}$ values – and is highly relevant to the written description analysis.

In numerous cases, this Court has considered the structural variability of the members of a genus, even though structure was not a claim element.  For example, the claims in *Carnegie Mellon* were directed to plasmids (pieces of DNA) that were broadly defined only by their function, *viz.*, encoding enzymes called DNA polymerase I from bacteria.  541 F.3d at 1123-1124.  The generic claims were not limited to particular DNA sequences; rather, they broadly encompassed

unspecified DNA sequences originating from any bacterial species.[4] But the patent disclosed the DNA sequence for only one bacteria, *E. coli*. *Id*. at 1125.

In considering whether the patent contained representative examples, the court discussed the *structural* variation within the claimed genus of DNA sequences. It noted, for example, that the claimed DNA sequence ("polA gene") "varied among the numerous bacterial species" and "has different *sequences* for probably all the different bacterial species." *Id*. at 1126-27 (emphasis added) (internal quotation marks omitted). The court expressly compared the sequences of DNA from other bacteria species within the claimed genus to that for the one species disclosed, *E. coli*, and noted that the former was "distinct from" the latter. *Id*. at 1125. It concluded that the written description requirement was not met because of the variation within the claimed genus and because the single disclosed embodiment was not representative of, and failed to adequately support, the entire claimed genus. *Id*. at 1126.

In another case, *In re Alonso*, 545 F.3d 1015, 1017-18 (Fed. Cir. 2008), the claim at issue recited a method of treating cancer in a patient by administering an antibody targeted to the particular patient's tumor. The antibodies encompassed by this claim were defined by their function, binding to the target tumor, and only a

---

[4] Just as proteins, like antibodies, are made up of amino acid building blocks and have an "amino acid sequence," DNA is made up of nucleotide building blocks and has a "nucleotide sequence."

single antibody was disclosed.  Looking to the *structure* of the antibodies encompassed by the patent claim's broad, functional definition – even though no antibody structure was recited in the patent claims – the court affirmed the PTO's rejection of the claims on written description grounds.  *Id.* at 1021-23.  It noted that "the antibodies required to perform Alonso's claimed method vary substantially *in their composition*," *id.* at 1020 (emphasis added), and that "a patentee of a biotechnological invention cannot necessarily claim a genus after only describing a limited number of species because there may be unpredictability in the results obtained from species other than those specifically enumerated," *id.* (quoting *Noelle v. Lederman*, 355 F.3d 1343, 1350 (Fed. Cir. 2004)).  *See Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324, 1330-31 (Fed. Cir. 2013) (validity of claim to genus of DNA sequences defined solely by function called into doubt under written description requirement where patent's description of only one gene sequence leaves the patent "far from providing even an indirect *structural identification* of all that would be within the claim's scope" (emphasis added)).

Just as the court in the above-cited cases considered the structure of the biological molecules encompassed within a patent's functionally-defined claims – even though the claims themselves were silent about structure – the jury here properly considered and relied upon evidence of the structure of the antibodies

encompassed within the Abbott patents' functionally-defined claims. Substantial evidence showed that the antibody examples disclosed in the patents were not representative of the members of the claimed genuses.

### 6. Abbott's Evidence Purporting To Show Disclosure Of Representative Species Is Not Relevant

Attempting, improperly, to unmoor the written description analysis from the variable structure of the antibodies encompassed by its broad claims, Abbott seeks to focus the Court on irrelevancies.

For example, Abbott argues about the *size* of the genus and the *number* of examples in the patents, and not whether the examples are representative of the antibodies actually encompassed by the genus. But no matter how many examples are disclosed, if they are all minor variations of one another, clustered in a small corner of the claimed genus, they cannot be representative of the genus as a whole, almost all of which remains uncharted. And that is the case here, where the examples disclosed are all from the Joe-9 family and have structures very similar to one another. A6585. In fact, as Inventor Veldman admitted, among 200 of the the examples, not one differed from another by more than a single amino acid. A7008. The examples are, in the words of the district court, "homogeneous." A13. Regardless of their number, the disclosed "homogeneous" species are not representative of the variability of antibodies claimed, and their disclosure does not enable the skilled artisan to reasonably predict the structure of the undisclosed

members of the genus. Six, 50 or 200 shades of red would not be representative of the variety of colors in a rainbow.

For the same reason, Abbott's suggestion that the patents' description is adequate because it discloses all known antibodies within the genus "but Stelara" is unfounded. As the district court ruled, the question was whether the disclosed species, however numerous, were *representative*, "a fact-intensive inquiry that is decided on a case-by-case basis." A13. Moreover, the evidence contradicts Abbott's "all but Stelara" argument. Expert Marks conceded that it is "not possible" to determine how many antibodies would fall within the claims, A7339; A7429, and the jury heard, and was entitled to credit, testimony that there could be many more antibodies within the scope of each claimed genus than the disclosed Joe-9 species and Stelara®. A6809-10; A7339; A7424.

As a backup, Abbott argues that the examples are representative of the variability of the *functional properties* of the antibodies, not the variability of the antibodies themselves. Abt. Br. at 32. But this, too, is irrelevant. It is of no moment that antibodies within the Joe-9 family, all of which are highly similar in structure, possessed different $k_{off}$ values because the patents' description of those antibodies does not indicate that the inventors were in possession of the full scope of the genus which encompasses antibodies of very different, and unpredictable, structures. If anything, the evidence that antibodies within the structurally similar

34

Joe-9 family can have different properties only underscores the unpredictability in this field and the fact that disclosure of the Joe-9 antibodies does not enable one to visualize or recognize *non*-Joe-9 antibodies that share the functional properties recited in the claims.

### 7. Abbott's Arguments Are Contrary To The Purpose Of The Written Description Requirement

Abbott's argument that any reliance on "unclaimed" structural differences would mean that a patentee would be required to disclose every antibody in the genus to support a genus claim is illogical. Abt. Br. at 38. This Court's precedent that a patent need not disclose every species within a claimed genus is not a license to claim what has not been invented. What an inventor must do is tailor his claims to the invention actually made and provide a description of the invention sufficient to evidence that he was actually in possession of the full scope of the claimed invention. He can properly claim a genus without disclosing every member of it by disclosing examples that are truly representative of the members of the genus, or by describing structural features that are common to the members of the genus. In that way, unlike here, the patent specification would evidence that he actually invented the full genus.

Even now, more than a decade after Abbott filed its first patent application, its witnesses agree that one cannot predict or identify what antibodies, other than those disclosed in the Abbott patents, would meet the functional goals set by the

patent claims. A6625. Other than describing the Joe-9 antibodies, the patents do

nothing more than set forth a research goal – human, neutralizing IL-12 antibodies

– and leave it for other scientists, like those at Centocor, to invent them. A "mere

wish or plan" for obtaining a claimed invention is not adequate written description.

*Eli Lilly*, 119 F.3d at 1566.

The Abbott claims exemplify the type of unsupported, functional patent

claim that the written description requirement is designed to police against. The

functional description of antibodies in the patents "merely draw[s] a fence around

the outer limits of a purported genus" but is "not an adequate substitute for

describing a variety of materials constituting the genus and showing that one has

invented a genus and not just a species." *Ariad*, 598 F.3d at 1350. Substantial

evidence supports the jury's verdict, and Abbott's JMOL motion was properly

denied.

## VII. THE JUDGMENT OF NONENABLEMENT SHOULD BE AFFIRMED

### A. Law Of Nonenablement

A patentee may choose to claim his invention narrowly or broadly, but "[a]

patentee who chooses broad claim language must make sure the broad claims are

fully enabled. The scope of the claims must be less than or equal to the scope of

the enablement." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008)

(internal quotation marks omitted). "Enabling the full scope of each claim is part of

the *quid pro quo* of the patent bargain." *Id.* (internal quotation marks omitted);

*Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (patent

must enable full scope of claimed invention).

The required disclosure includes providing specific starting materials;

otherwise, undue experimentation would be required to practice the claimed

invention. *Genentech*, 108 F.3d at 1366; *ALZA Corp. v. Andrx Pharms., LLC*, 603

F.3d 935, 941 (Fed. Cir. 2010).

### B.    A Wealth Of Evidence Supports The Nonenablement Verdict

A wealth of evidence supports the verdict reached by the jury after

considering all the evidence and being properly instructed on the law. A6641-46;

A6808-09; A15181-83.

Centocor presented evidence that was more than sufficient to show that the

asserted claims are invalid for lack of enablement because the specifications do not

enable the full scope of the claimed invention. The asserted claims are written so

broadly as to cover antibodies with a VH5 heavy chain, such as Stelara®. A6635.

Yet the evidence showed that the patents do not describe a single VH5 antibody

and fail to enable making any VH5 antibodies that would otherwise meet the

limitations of the asserted claims. The patents describe using the Vaughan phage

display library to make antibodies of the invention. A6642-44. However, a

publication about the Vaughan library indicates only that VH1, VH3 and VH4

antibodies were derived from the library. A6643. The patents do not teach using any other phage library. A6644. The patents also do not teach how to use a transgenic mouse to make any antibodies, let alone antibodies with a VH5 heavy chain that fall within the scope of the asserted claims. A6644-46; A7071-72. Expert Siegel testified, from the perspective of one of ordinary skill in the art, that the patents did not enable one to make and/or use the full group of antibodies encompassed by the claims. A6645-46.

Abbott's reliance on *In re Angstadt*, 537 F.2d 498 (CCPA 1976), for the proposition that the patents need only enable "representative species," is misplaced for two reasons.

First, as *Angstadt* cautions, "each case must be determined on its own facts," *id*. at 503, and the facts in *Angstadt* differ significantly from those here. The Angstadt patent claimed a method of catalyzing a particular reaction, using catalysts selected from a genus of metal salt complexes. The patent supplied a list of catalysts and taught how to make and use them, but did not disclose which ones would, or would not, work. The court determined that undue experimentation was not required to determine which would work. *Id.* In contrast, the Abbott patents do not disclose *any* way – starting materials or method – for making the VH5 antibodies encompassed by the claims. It is not a matter of trying disclosed

methods to see if they work; *no* methods are disclosed. The full scope of the claimed invention is not enabled.

Second, Abbott's argument relies on the mistaken proposition that it was enough to enable the antibody examples in the patent because they are "representative." But the jury was entitled to determine, based on strong evidence presented at trial (and summarized in Section VI above), that the antibodies disclosed in the patents were *not* "representative" of the broad scope of antibodies encompassed by the functional claim language. Indeed, the patents do not disclose a single VH5 antibody, or method for making such an antibody.

The jury's verdict of nonenablement was based on more than ample evidence that the patents do not disclose specific starting materials or conditions for making and using the full scope of the claimed invention. The district court properly denied Abbott's JMOL motion.

## VIII. THERE IS NO BASIS FOR VACATING AND REMANDING BASED ON COLLATERAL ESTOPPEL

### A. Abbott Waived Its Collateral Estoppel Argument

Abbott's collateral estoppel defense is not properly before this Court. Abbott failed to preserve this issue for appeal because it did not raise it in a motion for judgment as a matter of law.

#### 1. First Circuit Law Governs The Question Of Waiver

This Court applies the law of the regional circuit to consider procedural

issues, including whether an issue is preserved for appeal. *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1370 (Fed. Cir. 2010); *Streamfeeder, LLC v. Sure-Feed Sys., Inc.,* 175 F.3d 974, 984 n.2 (Fed. Cir. 1999) (applying regional circuit law to decide waiver of an argument raised in a summary judgment motion but not renewed in a JMOL motion).

The First Circuit generally will not review denial of a party's motion for summary judgment if there has been a full trial on the merits. *Ji v. Bose Corp.*, 626 F.3d 116, 127 (1st Cir. 2010). Instead, a party must restate its objections in a JMOL motion. *Id.* This is true even where the movant's summary judgment motion raises a purely legal question. *Id.* at 127-28 n.9 (recognizing that, unlike other circuits, the First Circuit requires renewal of summary judgment objections to a legal issue and is "bound by [its] precedents until the Supreme Court says otherwise"); *cf. Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011) (expressly declining to decide whether denial of a motion for summary judgment addressed to a purely legal question preserves the issue for review). Moreover, a JMOL motion must specify "the law and facts that entitle the movant to the judgment" sought, and "must be sufficiently specific so as to apprise the district court of the grounds relied on in support of the motion." *Parker v. Gerrish*, 547 F.3d 1, 12-13 (1st Cir. 2008) (internal quotation marks omitted); *see also Isom v. Town of Warren*, 360 F.3d 7, 9 (1st Cir. 2004).

### 2. Abbott Failed To Renew Its Pre-Verdict Motion For Summary Judgment On Collateral Estoppel

Pre-trial, Abbott moved for summary judgment that, due to the PTO's interference ruling, Centocor was collaterally estopped from alleging invalidity of the '128 patent. A2017-84. The motion was denied. A66-78. Abbott failed to renew its collateral estoppel objections at trial. Abbott presented a JMOL motion based solely on the legal sufficiency of Centocor's invalidity evidence, but did not raise collateral estoppel as a basis for JMOL. A6832-42; A7601; A2234-68. Accordingly, Abbott never notified the district court that collateral estoppel was a basis for its JMOL motion. Because Abbott did not preserve its collateral estoppel argument in a JMOL motion, it waived the issue for appeal. *See, e.g., Ji*, 626 F.3d at 127.

### B. If Collateral Estoppel Is Not Deemed Waived, The PTO's Decision In The Co-Pending Interference Still Does Not Preclude Centocor's Validity Arguments In The Infringement Action

Regional circuit law guides this Court's review of the criteria of collateral estoppel. *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). But "for any aspects that may have special or unique application to patent cases, Federal Circuit precedent is applicable." *Id.* (noting that Federal Circuit law applies to the question of whether one patent claim is the same as another patent claim); *see also Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,

170 F.3d 1373, 1381 n.4 (Fed. Cir. 1999) (explaining that Federal Circuit law

applies to application of *Blonder-Tongue*).

For a matter of federal law, collateral estoppel applies when: "(1) the issue

sought to be precluded in the later action is the same as that involved in the earlier

action; (2) the issue was actually litigated; (3) the issue was determined by a valid

and binding final judgment; and (4) the determination of the issue was essential to

the judgment." *Latin Am. Music Co. v. Media Power Group, Inc.*, 705 F.3d 34, 42

(1st Cir. 2013) (internal quotation marks omitted). For numerous, independent

reasons, the PTO's interference decision did not create an estoppel.

### 1. The Interference Decision Was Not A Binding Final Judgment

The interference decision was not a binding final judgment because it was

subject to *de novo* review by the district court in Centocor's timely-filed 146

Action.

A patent interference is "a multi-part action with appeal as of right, starting

in the PTO and culminating in court." *Vas-Cath, Inc. v. Curators of the Univ. of

Mo.*, 473 F.3d 1376, 1382 (Fed. Cir. 2007); *see* 35 U.S.C. §135;[5] *In re Van Geuns*,

946 F.2d 845, 846-47 (Fed. Cir. 1991) (explaining history of interference practice).

By statute, a losing party in an interference can either appeal directly to the Federal

Circuit, *see* 35 U.S.C. §141, or may proceed with a civil action, *see* 35 U.S.C.

---

[5] The pre-America Invents Act Patent Statute applies.

§146; *see also Rexam Indus. Corp. v. Eastman Kodak Co.*, 182 F.3d 1366, 1370 (Fed. Cir. 1999) (a §146 action "is derivative of the interference conducted in the PTO"). Indeed, the Patent Statute expressly provides that it is an interference decision "*from which no appeal or other review has been or can be taken*" that " shall constitute cancellation of the claims involved in the patent." 35 U.S.C. §135(a) (emphasis added).

Unlike other reviewing courts, the district court in a §146 action considers the record before the agency and any additional evidence the parties submit – including evidence the parties could not present to the PTO (*e.g.*, live testimony). *See Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1345 (Fed. Cir. 2000); 37 C.F.R. §41.154(a). The district court then makes *de novo* findings of fact based on all of the submitted evidence. *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 659 F.3d 1186, 1196 (Fed. Cir. 2011). In this regard, a §146 action is merely "an authorized phase of the interference proceeding" and, therefore, the interference ruling is not final and binding when it is issued by the PTO. *Vas-Cath*, 473 F.3d at 1382. Indeed, one of this Court's predecessor courts expressly recognized that where a court reviews a decision of the PTO in a trial *de novo*, "the decision of the [PTO] [can]not be accorded finality." *Coakwell v. United States*, 292 F.2d 918, 920 n.1 (Ct. Cl. 1961). There, the Court of Claims relied on the Supreme Court's interpretation of Revised Statutes §4915, the predecessor to modern 35 U.S.C.

§146. *See Morgan v. Daniels*, 153 U.S. 120, 124 (1894) ("[I]t might be well argued, *were it not for the terms of this statute*, that the decision of the patent office was a finality upon every matter of fact." (emphasis added)).

The cases cited by Abbott are not to the contrary. In *Pharmacia & Upjohn*, this Court applied Fourth Circuit law in determining that pendency of post-trial motions and the possibility of an appeal did not preclude a district court judgment's collateral estoppel effect. 170 F.3d at 1381. But that is distinct from the instant case where *de novo* review of the PTO decision was underway in the district court. In *Utah Construction*, the issue was specific to the Wunderlich Act, which expressly provided that administrative decisions on government contract disputes were "final and conclusive" and where the Court had previously determined that "Congress did not intend a *de novo* determination of the facts by the court, which must confine its review to the administrative record made at the time of the administrative appeal." *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 399-400 (1966). The opposite is true here. The PTO's decision was subject to *de novo* review by the district court in the 146 Action and was not a final, binding judgment.

## 2. Centocor Did Not Have A Full and Fair Opportunity To Litigate Validity At The PTO

Abbott's far-reaching contention that the PTO's obviousness determination estops Centocor from presenting *any* invalidity defense in the Infringement Action is wrong.

Collateral estoppel only applies if the losing party had a "fair opportunity procedurally, substantively and evidentially to pursue his claim the first time." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971). Collateral estoppel may not apply if a party "was deprived of crucial evidence or witnesses in the first litigation." *Id.*

Interference procedures at the PTO are designed to increase speed and decrease cost in reaching a priority determination. *See Johnston v. Beachy*, Interference No. 104,286, 2001 Pat. App. LEXIS 7 at *9 n.4 (B.P.A.I. 2001). PTO regulations limit the nature and extent of discovery as well as the type of evidence the Board will receive. *See* 37 C.F.R. §§41.150 (discovery), and 41.154(a) (evidence).[6] The PTO and this Court recognize that any shortcomings in the PTO's procedure may be addressed in the full evidentiary trial after the PTO phase of the interference. *See Johnston*, 2001 Pat. App. LEXIS 7 at *9 n.4 ("Limited administrative discovery . . . secure[s] a just, speedy, and inexpensive

---

[6] The PTO's "Standing Order" noted "[a]dditional discovery is rarely authorized." A15293.

determination of every interference. . . . [This is] consistent with the availability of an evidentiary trial, 35 U.S.C. 146, to review administrative interference decisions."); *see also Streck*, 659 F.3d at 1196 ("The purpose of §146 is to bring to bear, upon the contested issues of priority of invention, the procedures and rules of federal litigation . . . whereby judicial process is the final arbiter of the rights and issues administratively assigned to the PTO.").

In the consolidated 146/Infringement Action, fact discovery lasted eleven months. Abbott produced almost four million pages of documents. Centocor deposed eighteen inventors and at least seven other Abbott scientists. Centocor accessed the confidential crystal structure of Abbott's J695 antibody, on which its written description defense heavily relies. A6504; A6901.[7] And during trial, Centocor presented live testimony, giving the district court and the jury the opportunity to observe the witnesses and make credibility determinations.

Although the interference was a contested case, there was no trial conducted before a hearing officer or the Board. All evidence was presented by declaration. The Board received no demeanor evidence, a procedural characteristic of all Patent

---

[7] Very early in the interference, Centocor had to present a list identifying the motions it might make, or lose the opportunity to raise those issues at final hearing. 37 C.F.R. §§41.121(a), 41.204(b); A10125-27. It listed, among others, a motion attacking validity on §112 grounds, but ultimately opted not to pursue such a motion. A10126.

Office proceedings. *Winner*, 202 F.3d at 1347 (emphasizing the importance of live testimony in a §146 action).

Reduced process before the PTO is commensurate with Congress's plan because the PTO's decision is not a binding final judgment. *See supra* §VIII.B.1. Instead, the statutorily guaranteed §146 action is necessary to afford a litigant a fair opportunity to present its case. *Cf. Streck*, 659 F.3d at 1196. This reduced process makes no sense if collateral estoppel applies after the PTO phase of the interference, but before resolution of the 146 Action. The PTO phase of the interference did not afford Centocor a *full* and fair opportunity to litigate any invalidity issue. Collateral estoppel cannot attach to the PTO decision.

## IX. A NEW TRIAL WAS PROPERLY DENIED

Abbott seeks a new trial based on Judge Saylor's alleged abuse of discretion with respect to his evidentiary ruling precluding introduction of certain evidence of the interference and the alleged error in his jury instruction based on *i4i*. But neither of Judge Saylor's trial rulings were improper, much less abuses of discretion. Nor do they in any way represent the "extraordinarily compelling circumstances" needed to justify ordering a new trial in this case.

### A. Standard For A New Trial Based On Alleged Evidentiary Error

First Circuit law applies to review of the district court's evidentiary rulings. *Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1360 (Fed. Cir. 2001). "The First Circuit

reviews 'the exclusion of evidence for an abuse of discretion.'" *Id.* (quoting

*Achille Bayart & Cie v. Crowe*, 238 F.3d 44, 49 (1st Cir. 2001)).  This Court

previously noted that the First Circuit "afford[s] wide latitude to trial courts in

these purlieus, taking care to 'evaluate the trial court's decision from its

perspective when it had to rule and not [to] indulge in review by hindsight.'" *Id.*

(quoting *United States v. Winchenbach*, 197 F.3d 548, 559 (1st Cir. 1999)).

Accordingly, "[o]nly rarely – and in extraordinarily compelling circumstances –

will [the First Circuit] from the vista of a cold appellate record, reverse a district

court's on the spot judgment concerning the relative weighing of probative value

and prejudicial effect." *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 346 (1st

Cir. 1998) (internal quotation marks omitted).

Even where the First Circuit determines that a district court has abused its

discretion "in striking the Rule 403 balance," that "does not, however, end [the]

analysis." *Espeaignnette v. Gene Tierney Co.*, 43 F.3d 1, 9 (1st Cir. 1994).

Instead, the court grants a new trial only where an evidentiary error is harmful and

"affect[s] the substantial rights of the parties." *Kelley*, 140 F.3d at 346 (quoting

Fed. R. Civ. P. 61).

Far from representing an abuse of discretion, Judge Saylor's refusal to allow

Abbott to introduce confusing evidence of the interference proceeding, so that it

could argue adverse inferences based on Centocor's participation in that

proceeding, was soundly based on a Rule 403 balancing of relevance and potential prejudice. The record reflects the district court's careful and extended consideration of the issue and presents no "extraordinarily compelling circumstances" supporting reversal of his judgment. *See supra* §IV.B. Moreover, the district court expressly noted the opportunities Abbott had to introduce relevant evidence, and Abbott's failure to do so.

### B. The Challenged Evidentiary Rulings Were Entirely Appropriate

#### 1. The Court Properly Foreclosed Abbott From Presenting Confusing Evidence Of Marginal Relevance

Judge Saylor properly exercised his discretion in excluding certain evidence of the interference because there was a high risk of jury confusion and because the results of the interference were non-final and subject to *de novo* review. He explained his concern that if certain evidence of the PTO interference decision were admitted, the jury could be confused and conclude that "people a lot smarter than us" had already decided the invalidity issue and that all they were supposed to do was "rubber stamp" the PTO's decision. A6016; A7285. He also expressed his concern that, if the door were opened to Abbott arguing that Centocor participated in the interference and could have presented certain evidence in the proceeding, then additional, lengthy evidence about the nature of an interference proceeding would have to be allowed. A6467-69; A7743-45.

Under circumstances similar to those of which Abbott complains here, this Court has held that it is ***not*** an abuse of discretion for a district court to prevent jury confusion by precluding the introduction of evidence regarding non-final, post-issuance proceedings before the PTO. *See, e.g., Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009) (denying new trial based on ruling that precluded evidence of non-final, parallel *inter partes* reexamination because of high risk of jury confusion and little relevance); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1380 (Fed. Cir. 1998) (excluding expert's reference to interference decision finding the asserted patent to be non-obvious because U.S. Surgical would be improperly "augmenting the credibility of its expert's testimony").

Abbott argues that, despite the complications and potential for jury confusion that would have attended introduction of evidence of the interference, it should have been permitted to do so because the jury could learn that "Centocor had *already* had an opportunity to challenge the validity of the '128 patent." Abt. Br. at 49-50. But the fallacious reasoning behind this proposition was revealed when, after repeated questions from the court as to why this was relevant, Abbott's counsel finally admitted its position that "[t]he fact that Centocor raised this issue, and they're now raising it again, should make it *almost impossible* to overcome the presumption of validity and be clear and convincing." A6773 (emphasis added).

The court recognized this as the legally unfounded "stealth collateral estoppel" argument it actually was and that introduction of evidence of Centocor's participation in the interference proceeding would open the door to a "slippery slope" of complicated evidence about interference proceedings and about Centocor's decisions that would greatly lengthen trial and burden the jury. A6429; A6468-69; A7743-45. And, contrary to Abbott's suggestion, Abt. Br. at 18-19, Centocor opened no door to evidence regarding the interference; its expert's testimony regarding his "independent analysis" was elicited by *Abbott's* cross-examination. A6685-86. Judge Saylor's Rule 403 order, based on his judgment of the probative value and unfair effect of the evidence, was entirely proper.

Abbott's suggestion that the district court prevented it from presenting evidence relating to the *ex parte* prosecution history distorts what really occurred at trial and the reasons why Abbott was foreclosed from questioning witnesses on certain aspects of the prosecution history. Abt. Br. at 54. Abbott *did* have an opportunity to introduce evidence of what was or was not before the PTO. The entire *ex parte* prosecution histories for the patents-in-suit were admitted into evidence. The court told Abbott that it was *permitted* to introduce testimony regarding the *prior art* that was or was not in front of the PTO during the prosecution of the patents-in-suit. A6467. Abbott was invited to try to prove that

the invalidity evidence Centocor relied on was not material because it was cumulative. A7495-96.

In spite of the court's repeated invitation to Abbott to present testimony comparing the invalidity *evidence* before the PTO with that asserted by Centocor, Abbott failed to put forth a proper witness to testify in detail on the prosecution history. It attempted to have expert Marks testify about whether the PTO considered the "issue of phage display" before it issued the patents, but this was not in Dr. Marks' expert report. A7262-63; A7281-82; A7720; A7731; A10741-46. Nonetheless, Abbott *was* permitted to ask questions on whether phage display art was considered by the PTO. A7588-7589. Other than these few questions on phage display prior art, Abbott never had Dr. Marks or any other witness testify regarding other evidence before the PTO, or the extent to which any evidence relied upon by Centocor was simply cumulative of that considered by the PTO.

Contrary to Abbott's suggestion that it was precluded from eliciting testimony that the PTO had considered the written description and enablement issues, Abt. Br. at 51, Abbott *did* question other witnesses – including Dr. Marks – about whether or not the file history showed that the PTO considered those issues. A7261-63. Abbott was even permitted to ask if the PTO, after considering the issues of written description, enablement, and obviousness, determined that the patents-in-suit should issue. *Id.*

Dr. Marks was not the only person to speak to the jury on these issues. Abbott's counsel emphasized, both in opening and closing, that the PTO already considered the very issues that the jury was being asked to resolve and still allowed Abbott's patents. A6151; A7645; A7671 (referring to A11917).

## 2. Abbott Mis-Describes The Record

In an attempt to create the appearance of "cumulative prejudice," Abbott argues that a centerpiece of Centocor's defense was "repeatedly" urging the jury "to accord special weight to the evidence that the Board 'did not have'" and "listing at length . . . putatively 'new' information" the PTO did not have (Abt. Br. at 17, 54-56, 60). But, notably, in the space of a two week trial, Abbott points to only three statements of Centocor's counsel where this was allegedly done, each of which was entirely true and correct.

In closing, Centocor's counsel summarized the evidence relating to a key prior art reference, the Meager article, and stated that "[t]here's no indication that the patent examiner before he issued these patent claims knew of and considered the Meager article." A7632-33. This was a true statement; Abbott has not contended otherwise. The Meager article was important and material prior art because it showed that human antibody genes were actually capable of making antibodies that neutralize IL-12, which meant that technologies using human genes could be used to make human anti-IL12 antibodies. A6676-77; A6805.

53

Two other true statements made in Centocor's counsel's opening and closing statements regarded the crystal structure evidence that had not been considered by the PTO.  In opening, counsel stated that Centocor would "present evidence that the patent office did not have and could not consider when it issued Abbott's patents."  A6145-46.  Centocor presented evidence of the crystal structure of Abbott's J695 antibody bound to IL-12, a key piece of evidence supporting the written description defense.  A7616; A7625.  This evidence was never provided to the PTO and, since it was Abbott's confidential information produced in the litigation, it could not have been presented by Centocor to the PTO.  A6504; A6901.  In closing, Centocor's counsel said that "the information of how J695 binds to IL-12, that's information the Patent Office did not have when it issued these patents."  A7616.  Another true statement.  Why Abbott continues to complain about these true statements, when its own counsel conceded, and the district court found, that they were factually accurate, A6248; A34 – and when the district court even chastised Abbott, in connection with its emphasis on these statements, for "tending to overstate things and to take certain things out of context or to put too much emphasis on them," A7717-18 – is a mystery.

Equally baseless is Abbott's suggestion that Judge Saylor was somehow confused in his rulings.  Abt. Br. at 53-55.  Although, early in the course of arguments on the issue, he commented that it seemed Abbott should be able to

argue an inference from the fact Centocor did not cite certain prior art to the PTO, Abt. Br. at 52-53 (citing A6423), it could not have been clearer from the *complete record* that he changed his mind and determined that any possible relevance of such an argument was outweighed by the prejudice of allowing Abbott to open the "can of worms" of the interference record. Abbott's reliance on this comment from the judge, clearly in the nature of a thinking-out-loud comment, is disingenuous.

Centocor concedes that Judge Saylor's statement, in his ruling from the bench on Abbott's new trial motion, that he had not excluded the fact that Centocor participated in that proceeding was mistaken. A35. Evidence of Centocor's participation *was* excluded, for all of the valid reasons Judge Saylor presented in his multiple rulings during trial. However, this one misstatement does not mean that his rulings were confused or mistaken. And the reasoning he gave for excluding that evidence, such as the potential for jury confusion, was the same reasoning he gave for his exclusion orders at trial. A35-39.

Moreover, six weeks earlier, at the hearing on the new trial motion, Judge Saylor's comments on the scope of his ruling regarding evidence of the interference were entirely consistent with the rulings reflected in the trial record. He explained, yet again, that he had excluded the interference proceeding based on a Rule 403 balancing, that evidence before the PTO in the interference was in

bounds, but the proceeding itself would have confused the jury. He explained that, if the jury had been told about the interference, lengthy evidence about the nature of such proceedings would have been needed, at the cost of greatly lengthening the trial and confusing matters, and that this prejudice outweighed any potential relevance. A7743-45. The single misstatement in the oral new trial ruling to which Abbott clings was an obvious misstatement and an outlier; Judge Saylor's rulings were clear, consistent, and correct.

### 3.  Abbott Has Not Shown That Judge Saylor's Rulings Affected Its Substantial Rights

Even if Judge Saylor's Rule 403 rulings were deemed to be an abuse of discretion, and they were not, Abbott is not entitled to a new trial because it has not explained exactly what evidence it would have admitted, and how exclusion of that particular evidence affected its substantial rights. It engages in hand-waving about "prosecution history" and "arguments," ignoring that (a) the *ex parte* file histories were admitted into evidence, (b) its expert testified that the issues of written description, enablement and obviousness were considered by the PTO before it allowed the claims, (c) its expert testified that the PTO considered specific prior art references relating to phage display, (d) it never took Judge Saylor up on the invitation to have the jury instructed on precisely what prior art had been before the PTO, and (e) it never took Judge Saylor up on the invitation to have its experts compare Centocor's prior art with that before the PTO. Abbott cannot remedy the

failure of its own proofs by complaining about Judge Saylor's careful and well-founded evidentiary rulings.

Abbott's arguments that it is entitled to a new trial because it was improperly foreclosed from presenting evidence regarding the prosecution of the patents-in-suit are neither grounded in the record nor supported by the law, and should be rejected.

## C. The *i4i* Instruction Was Proper

Relying primarily on dicta in a single, 29 year-old decision, *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452 (Fed. Cir. 1984), Abbott argues that a new trial is warranted because Judge Saylor allegedly erred in failing to instruct that Centocor bore the burden of showing that prior art it relied upon was "more relevant" than prior art considered by the PTO and that, if it did not meet that burden, its clear and convincing burden would be especially difficult to meet. Because *i4i* fails to impose such a requirement, Judge Saylor correctly rejected Abbott's erroneous jury instruction and its request for a new trial on this ground.

### 1. The *i4i* Instruction

Both parties requested an instruction consistent with *Microsoft v. i4i*; their views on what that instruction should say differed.

i4i stands for the principle that a challenger bears the burden of proving invalidity by clear and convincing evidence, and that burden does not lessen when the challenger relies on art that was not cited to the PTO during prosecution. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2246-49, 2250 (2011). Nor does that burden become greater when the challenger relies on art that *was* considered by the PTO. *Id.* at 2250 ("Nothing in § 282's text suggests that Congress meant . . . to enact a standard of proof that would rise and fall with the facts of each case.").

The court's careful consideration of the *i4i* case, following substantial briefing and argument, A7479-7506; A7519-42; A2151-A2233, was accurately reflected in the issued jury instruction, which closely mirrored the language in *i4i*:

| *i4i*<br><br>**131 S.Ct. at 2251 (emphasis added)** | **Jury Instruction**<br><br>**A15177 (emphasis added)** |
|---|---|
| When warranted, the jury may be instructed to consider that it has heard evidence that the PTO had no opportunity to evaluate before granting the patent.<br><br>[T]he jury may be instructed to evaluate whether the evidence before it is *materially new*, and if so, to consider that fact when determining whether an invalidity defense has been proved by clear and convincing evidence. | You have also heard evidence that there was additional information that [the Patent Office] did not have an opportunity to consider.<br><br>You should consider whether that *additional information would have been material* to the PTO's decision to grant the patents. . . . If you conclude that any additional information would have been material, you should consider that fact when determining whether Centocor has proved invalidity by clear and |

|  | convincing evidence. |
|---|---|

Judge Saylor explained that he read "materially new" in *i4i* to mean material and not previously considered by the PTO.  A7487; A7520-23.  He used the phrase "additional information would have been material" rather than "materially new" because "new" could be ambiguous; it could be "new" chronologically or it could be additional.  A7727.  He also instructed the jury that, "[i]nformation is material if there's a substantial likelihood that a reasonable patent examiner would consider it important in deciding whether to allow the application to issue as a patent." A15176.

### 2.     Judge Saylor Properly Declined Abbott's Proposed Instruction

Judge Saylor declined Abbott's request for an instruction that included:

The clear and convincing standard may be more easily be [sic] met when the prior art not considered by the Patent Office is more relevant than the considered prior art.  Conversely, when the prior art relied on is the same as or no more relevant than the prior art considered by the Patent Office, the clear and convincing standard may be especially difficult to meet.  Centocor bears the burden of showing that the prior art not considered is more relevant than the prior art that was considered.

A2173-A2174.

*i4i* provides no support for Abbott's suggestion that it was Centocor's burden to prove that information relied on was more material than information before the PTO, and that if Centocor did not meet that burden, the clear and

convincing burden could be especially difficult to meet. *i4i* states that "if the PTO did not have all material facts before it, its considered judgment may lose significant force." *i4i*, 131 S. Ct. at 2251. It says that the jury "may be instructed to evaluate whether the evidence before it is materially new"; it does not say that the art must be "more material" as Abbott contends. *Id*. at 2251.

Because the *i4i* case fails to adopt the "more material" position Abbott espouses, Abbott relies on one sentence from *American Hoist*. But *American Hoist*, as Judge Saylor acknowledged at trial, uses nothing more than an "infelicitous phrase" that Abbott has latched onto to try to circumvent Supreme Court precedent. A7520. And even that lone sentence, which is dicta, does not support Abbott's position. *American Hoist* states that the clear and convincing standard "may" more easily be met when the non-considered art is more pertinent than the cited art. 730 F.2d at 1459. It does not hold, as Abbott erroneously argues, that the non-considered art *must* be *more* material than the considered art for the jury to consider giving it more weight and make it easier for the challenger to meet its clear and convincing evidence burden, or that it was somehow Centocor's burden to prove materiality. *American Hoist* and *i4i* provide no support for Abbott's "more material" argument. Judge Saylor's *i4i* instruction was correct.

### 3. There Was No Prejudice

Even an erroneous instruction (and this is not one) warrants a new trial only if "the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting party." *Goodman v. Bowdoin College*, 380 F.3d 33, 47 (1st Cir. 2004) (internal quotation marks omitted) ("Our review of the challenged instructions considers the big picture, asking whether the charge in its entirety – and in the context of the evidence – presented the relevant issues to the jury fairly and adequately."). Abbott establishes no such prejudice.

The sole paragraph in Abbott's brief addressing prejudice suggests, wrongly again, that evidence or argument about prior art being "new" versus what was before the PTO was somehow a centerpiece of Centocor's case. *See* Abt. Br. at 60-61. That is hardly the case. Centocor merely pointed out that certain information had not been considered by the PTO. The properly instructed jury was entitled to determine for itself whether that evidence was "material" under the court's instruction, and, if found to be material, to consider that when determining whether Centocor had proven invalidity by clear and convincing evidence. A15176-77.

Abbott's real beef seems to be that *Centocor* did not compare the new information with the information before the PTO, but, if Abbott really thought it could benefit from the comparison, *it* could have made it for the jury. As Judge

61

Saylor advised, Abbott was free to show that the "new [invalidity] materials from Centocor are not material, they're trivial, they're duplicative, they're a waste of time." A7496. If Abbott had made such a showing, it could have taken advantage of the jury instruction that "Centocor's burden may be more difficult to meet" where "the additional information was not material or if it would not have carried significant weight." A15177. But it did not make this showing. As Judge Saylor told Abbott's counsel at the hearing on post-trial motions, "that's your fault for not putting in the right witness." A7731.

Moreover, any Abbott complaint of prejudice stemming from Judge Saylor's refusal to give the requested instruction regarding the PTO's consideration of prior art rings hollow in view of the fact that *Abbott has not even challenged the jury's obviousness verdict*. Abbott makes no effort to explain why the jury's verdict would likely have been different, had the jury been instructed according to its wishes.

Abbott's attempt to muster an appearance of error and prejudice is unavailing. Abbott's request for a new trial for this second reason should also be denied.

## CONCLUSION

The judgments entered in both the Infringement Action and the 146 Action should be affirmed.

Dated:  November 29, 2013        Respectfully submitted,


By:  */s/ Dianne B. Elderkin*

    Dianne B. Elderkin
    Barbara L. Mullin
    Steven D. Maslowski
    Angela Verrecchio
    Matthew A. Pearson
    Akin Gump Strauss Hauer & Feld LLP
    Two Commerce Square
    2001 Market Street, Suite 4100
    Philadelphia, PA 19103-7013
    Phone:  (215) 965-1200
    Fax:  (215) 965-1210

    Emily C. Johnson
    Akin Gump Strauss Hauer & Feld LLP
    Robert S. Strauss Building
    1333 New Hampshire Avenue, NW
    Washington, DC 20036-1564
    Phone: (202) 887-4000
    Fax: (202) 887-4288


    *Counsel for Defendants-Appellees*
    *Janssen Biotech, Inc. and*
    *Centocor Biologics, Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Federal Circuit Rule 32(b), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Federal Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b), the brief contains 13,984 words.

2.     This brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied on the word count feature of this Microsoft Word in preparing this certificate.

Dated: November 29, 2013                    /s/ Dianne B. Elderkin
                                            Dianne B. Elderkin

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Defendants-Appellees

with the Clerk of the United States Court of Appeals for the Federal Circuit via the

CM/ECF system this 29th day of November, 2013, and served a copy on counsel

of record by the CM/ECF system and by electronic mail.

Dated:    November 29, 2013                    /s/  Angela Verrecchio
                                               Angela Verrecchio